<u>IN THE UNITED STATES DISTRICT COURT</u>
<u>FOR THE DISTRICT OF MARYLAND</u>

| | | |
|---|---|---|
| NORMA I. WINFFEL, et. al, | * | |
| *Plaintiffs*, | * | |
| v. | * | Case No. 8:19-cv-00838-TDC |
| WESTFIELD, LLC, et. al, | * | |
| *Defendants*. | * | |

<u>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT</u>
<u>OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

Defendants, Westfield, LLC, Montgomery Mall Owner, LLC, Professional Security Consultants and Professional Security Concepts, Inc. (collectively the "Defendants"), by and through their attorneys, Council, Baradel, Kosmerl & Nolan, P.A. and Brian T. Gallagher, and Bancroft, McGavin, Horvath & Judkins, P.C. and Heather K. Bardot, pursuant to the Federal Rules of Civil Procedure Rule 56, move this Honorable Court for Summary Judgment in the above captioned matter and in support thereof, state the following:

## I.    INTRODUCTION

There is no question that what happened at the Montgomery Mall on May 6, 2016 was an unspeakable tragedy. However, there is only one person responsible for the suffering and loss arising out of the brutal attack at the Montgomery Mall, and that is the shooter, Eulalio Tordil. Tordil was not a rational man. He planned out and killed his wife in the parking lot of their children's school. He then went on the run for eighteen hours, crossing over state lines, before returning to Maryland in a suspected attempt to carjack a patron of the Montgomery Mall, in broad daylight, at lunchtime, in the same parking lot as a marked Montgomery County Police cruiser.

Defendants cannot be held liable for a completely unforeseeable, unpredictable and random act of a third-party criminal.

Plaintiffs brought suit against Defendants alleging damages resulting from Tordil's attack in which Malcom Winffel and Carl Unger were shot by Eulalio Tordil[1]. This crime took place in a parking lot (hereinafter "Premises") owned and operated by Westfield, LLC and Montgomery Mall Owner, LLC (hereinafter "the Mall"). At the time of the crime, Professional Security Consultants (hereinafter "PSC") was contracted by Westfield, LLC and Montgomery Mall Owner, LLC to provide security for the Premises, including the parking lots[2]. Plaintiffs allege counts of: (1) Wrongful death of Malcom Winffel; (2) Survival Action as to Malcom Winffel; (3) Negligence as to Carl Unger; and (4) Loss of Consortium as to Carl Unger and Virginia Henderson.

"Every person in society is subject to the risk of personal injury or property damage from criminal activity, both inside and outside his abode." *See Scott v. Watson*, 278 Md. 160, 167, 359 A.2d 548, 556 (1976). Unfortunately, this risk was realized by plaintiffs when Mr. Winffel and Mr. Unger fell victim to an unforeseen brutal attack. However, this attack was not the result of any negligence on the part of Defendants. There was no condition on the property that increased the risk of crime. In fact, there was only one violent crime on the Premises, in a different parking lot, three years prior to Tordil's attack. PSC was fully staffed and patrolling the parking lot at the time of the shooting. There was a police officer located fifty yards from the scene of the crime. Defendants were in communication with Montgomery County Police in order to maintain awareness of relevant crime in the area and on May 6, 2016, there was no alert put out to the public

---

[1] Mr. Tordil is not a party to this action; he is currently serving life in prison without the possibility of parole as well as three additional life sentences in Montgomery County, followed by two life sentences in Prince George's County.
[2] Professional Security Concepts, Inc. was in no way involved in providing any security at the Montgomery Mall. Plaintiffs' counsel has been asked, on multiple occasions to dismiss this defendant, but has inexplicably refused to do so.

or relayed to Defendants to put them on notice that Tordil was a legitimate threat. Tordil had committed a crime in an adjacent county and went missing for eighteen hours – presumably fleeing as far as he could get from the scene of the previous day's murder of Gladys Tordil. The mere fact that the occurrence took place on property belonging to Westfield, LLC and Montgomery Mall Owner, LLC, for which PSC was contracted to provide security, is not sufficient to hold Defendants responsible for the heinous acts of third persons.

Under Maryland law, a property owner is not responsible for criminal acts on his or her premises. Rather, a property owner is responsible for the conditions of the Premises. A property owner owes a duty to take reasonable measures to correct conditions on the Premises that contribute to criminal activity only where the property owner has knowledge of increased similar criminal conduct on the Premises that was facilitated by such conditions. *Rhaney v. Univ. of Md.,* 388 Md. 585, 599–600, 880 A.2d 357, 365 (2005). The property owner's failure to remediate such conditions may only be a proximate cause of the occurrence if the condition made the occurrence foreseeable and enhanced the likelihood of the occurrence. *Id.*

Further, "a private person [such as PSC here] is under no special duty to protect another from criminal acts by a third person, in the absence of statutes, or of a special relationship." *Scott,* 278 Md. at 166, 359 A.2d at 552, (*citing* [Restatement of Torts (Second) § 315](#) (1965) (no duty to control third person's conduct so as to prevent physical harm to another unless a special relation exists between actor and third person, or between actor and the other)). Special relationships arise only in narrow circumstances. *Durden v. United States*, 736 F.3d 296, 304 (4th Cir. 2013).

In this case, Defendants are entitled to Summary Judgment because: (1) Defendants did not owe any duty to plaintiffs because there was no history of similar criminal acts occurring on the premises that made the occurrence foreseeable; (2) Defendants did not breach any duty to

plaintiffs because there is no evidence that Defendants failed to correct any condition on the premises that contributed to criminal activity; (3) Defendants were not the proximate cause of the alleged occurrence as Defendants were not a substantial factor in causing the occurrence and did not enhance the likelihood of the occurrence; and (4) PSC did not stand in a special relationship to plaintiffs and would have had no duty to act to prevent Tordil from injuring plaintiffs even if such a duty existed. Additionally, Defendants are entitled to Summary Judgment because: (1) Plaintiffs' security expert fails to meet the standards set forth by Federal Rule of Evidence 702 and enunciated in *Daubert,* as such his opinion amounts to "Because I Say So" testimony[3]; and (2) Defendants did not fail to meet the standard of care regarding negligent security, as the incident was not foreseeable.

## II.  STATEMENT OF MATERIAL FACTS NOT GENUINELY IN DISPUTE

On May 5, 2016, at approximately 4:38 p.m., Eulalio Tordil (hereinafter "Tordil") shot and killed his wife while she was picking up their children at High Point High School, located in Beltsville, Prince George's County, Maryland. Complaint, at ¶ 26. Tordil's murder of his wife was a targeted domestic attack. Following the fatal shooting, Tordil fled the scene and a manhunt was subsequently launched. *Id.* at ¶¶ 26–27. While at large, Tordil's license plate was picked up by license plate readers in multiple jurisdictions, including in Frederick County, Maryland and in Virginia, as far as thirty miles away from the location of the initial shooting. *Id.* at ¶ 32. Tordil was

---

[3] The Court in *Wood v. Toyota Motor Corp.* affirmed the Court's decision in *Beatty v. Trailmaster*, 330 Md. 726, 625 A.2d 1005 (1993) to exclude expert testimony where an expert could "offer no 'scientific evidence . . . [or] sound data to buttress his opinion.' In that case, the expert had in essence furnished a 'because I say so' explanation for his conclusion that a device installed on a motor vehicle was unsafe." 134 Md. App. 512, 525, 760 A.2d 315, 323 (2000) (citing *Beatty v. Trailmaster*, 330 Md. 726, 740, 625 A.2d 1005, 1012 (1993). The Court explained that the expert opinion was rejected on the grounds that "[o]ur cases hold that 'an expert's opinion is of no greater probative value than the soundness of his reasons given therefore will warrant." *Beatty*, 330 Md. at 741, 625 A.2d at 1012 (citing *Surkovich v. Doub*, 258 Md. 263, 272, 265 A.2d 447, 451 (1970).

at large for eighteen hours before he emerged at the Westfield Montgomery Mall, located over fifteen miles away from High Point High School. *Id.* at ¶ 35.

On May 6, 2016, around 11:15 a.m., Tordil arrived at the mall and approached a woman in the Macy's parking lot near her vehicle, in what is assumed to be an attempted carjacking. *Id.* at ¶¶ 35–36. At the same time, Carl Unger and Malcom Winffel arrived at the parking lot to get lunch at the food court. *See* Deposition Transcript of Carl Unger, <u>Exhibit A</u>, at 56:16–57:7. Upon their arrival, the woman ran towards them shouting "Help me." *Id.* at 62:10–19. When Unger and Winffel attempted to intervene, Tordil began shooting at them. *Id.* Mr. Winffel was fatally shot twice in the chest, and Mr. Unger was shot three times in the back and once in the foot. <u>Complaint</u>, at ¶¶ 38–39. Tordil "looked at [them] and smiled and just started shooting." <u>Ex. A</u>, at 63:9–11.

At the time of the attack, Police Officer David Kocevar was parked in the Macy's parking lot in a marked police cruiser with a lightbar about fifty yards away from the scene of the crime. *See* Deposition Transcript of Officer David Kocevar, <u>Exhibit B</u>, at 41:7–42:12; 56:9–13. Kocevar was not aware of any alert issued by the Montgomery County Police Department regarding Tordil. *Id.* at 28:11–17; 29:6–11. Upon hearing the gunfire, Kocevar immediately exited his vehicle and ran towards the scene. *Id.* at 44:12–45:2; 46:19–22. Upon his approach, he spotted Tordil running away on foot. *Id.* at 47:4–12. Tordil subsequently fled the mall and travelled to Aspen Hill, Maryland where he shot and killed another individual before being apprehended. <u>Complaint,</u> at ¶ 40. Tordil pled guilty to all of the crimes and is currently serving life in prison. *Id.* at ¶ 41.

The mall was owned and operated by Montgomery Mall Owner, LLC, a Delaware Corporation, and managed by Westfield, LLC, a Delaware Corporation. *Id.* at ¶¶ 11–13, *see also* Deposition Transcript of Todd Heipler, <u>Exhibit D</u>, at 11:19–22. The mall was contracted with PSC at the time of the incident in order to provide security for the Premises. <u>Complaint</u>, at ¶ 17.

PSC is a California corporation specializing in providing security to malls, government municipalities, hotels and private communities. *Id.* at ¶ 15–16. PSC is a "hands-off" company, as is customary in the industry. *See* <u>Ex. C</u>, at 15:19–22. The PSC employees at the mall were unarmed and are trained to observe and report to the police department in the case of any criminal activity. *Id.* at 16, 1–3; 17:2–6. At the time of the incident, PSC relied on the Montgomery County Police Department to provide employees with information that is pertinent to the property, and to alert it if there was a threat to the mall. *Id.* at 44:13–15; 62:11–22.

The main function of PSC was to maintain a visible presence at the mall to deter criminal activity. *See* Deposition of Ninette Wilson, as <u>Exhibit E</u>, at 19:1–21; *see also* <u>Ex. C</u> at 165:3–7. Other deterrents present at the mall included security cameras, specifically a large domed camera located on the Macy's building adjacent to the parking lot where the shooting occurred. *Id.* at 160:22–161:2. On a "normal Friday" there were five PSC employees on duty. *Id.* at 92:11–20. On May 6, 2016, at the time of the incident, there were seven PSC employees on patrol at the mall. <u>Ex. D</u>, at 30:16–22. On that day, PSC employee, Ninette Wilson, and trainee Steve Gonzalez, were performing mobile patrol of the parking lots. *Id.* at 32:4–13. During the patrol, Wilson and Gonzalez were driving a Mitsubishi truck marked with the PSC security logo, with an illuminated light bar. *See* <u>Ex. E</u>, at 20:8–21:6. During patrol, PSC employees would circle the mall parking lot to scan forty-four specific security markings to ensure the entire Premises was being monitored. *Id.* at 27:14–22. Wilson and Gonzalez scanned the security markings in the area of the Macy's parking deck "within five to ten minutes" prior to Tordil's attack. *Id.* at 48:13–17.

Prior to the May 6, 2016 incident, there were no violent and/or similar incidents reported to have occurred in the Macy's parking lot in the five years leading up to the incident. *See* Deposition Transcript of Mauricio Bazan, <u>Exhibit F</u>, at 39:16–19. There was only one prior violent

crime that had occurred at the mall three (3) years prior to Tordil's attack, a stabbing in a parking lot on the opposite side of the mall from the Macy's lot. *See id* at 40:4–9; *see also* <u>Ex. D</u>, at 102:9–20. There were no known incidents by Tordil at the mall until the May 6, 2016 shooting.

## III.   STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of showing there is no genuine dispute of material facts. See *Casey v. Geek Squad*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props*., 810 F.2d 1282, 1286 (4th Cir. 1987)). If the moving party establishes there is no evidence to support the non-moving party's case, the burden shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial. The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Id*. at 349 (quoting *Mitchell v. Data Gen. Corp*., 12 F.3d 1310, 1315–16 (4th Cir. 1993)). The existence of a "scintilla of evidence" in support of the non-moving party's position is insufficient; there must be evidence on which the jury could reasonably find in its favor. *Id*. at 348 (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation or building one inference upon another." *Id*. at 349 (quoting *Miskin v. Baxter Healthcare Corp*., 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

## IV.   ARGUMENT

There are no facts to support a finding that Defendants owed a duty to plaintiffs to protect them from the malicious, unforeseen criminal conduct of unknown third persons on the Premises. There is no evidence whatsoever that Defendants breached any such duty by failing to remove conditions on the Premises of which they were aware that caused or contributed to criminal

activity. There is no genuine dispute that Defendants were not the proximate cause of plaintiffs' alleged injuries. Furthermore, the occurrence was not imminent and/or foreseeable.

A.     **Defendants Are Entitled to Summary Judgment Because Defendants Did Not Owe a Duty to Plaintiffs to Protect Them from the Unforeseeable Criminal Conduct of Third Parties**

To state a claim for negligence under Maryland law, plaintiffs must prove the existence of four elements: "(1) that the defendant was under a duty to protect the plaintiff from injury; (2) that the defendant breached that duty; (3) that the plaintiff suffered actual injury or loss; and (4) that the loss or injury proximately resulted from the defendant's breach of the duty. *See Patton v. United States Rugby Football Union, Ltd.*, 381 Md. 627, 635–36, 851 A.2d 566, 570 (2004). "The existence of a legally recognized duty owed by the defendant to the plaintiff or to a class of persons of which the plaintiff is a member is vital to sustaining a cause of action in negligence." *Muthukumarana v. Montgomery County,* 370 Md. 447, 486, 805 A.2d 372, 387 (2002). The well-settled law of this state unequivocally holds that the existence of legal duty is a question of law to be decided by the Court. *Corinaldi v. Columbia Courtyard, Inc.,* 162 Md. App. 207, 218, 873 A.2d 483, 489 (2004). Thus, "the existence of a legal duty is a question of law to be decided by the court." *See Moore v. Jimel, Inc.,* 147 Md. App. 336, 338, 809 A.2d 10, 11 (2002).

1.     **Defendants Did Not Owe a Special Duty to Protect Plaintiffs from Criminal Activity**

"Every person in society is subject to the risk of personal injury or property damages from criminal activity, both inside and outside his abode." *See Scott*, 278 Md. at 167, 359 A.2d at 554. There is no special duty in Maryland for a storekeeper to protect his invitees against crimes perpetrated by third parties on the storekeeper's Premises. *See id.* at 166, 359 A.2d at 552; *see also Moore*, 147 Md. App. at 345, 809 A.2d at 15 (stating that "[a] higher duty to protect a private person from the conduct of a third party arises under Maryland Law only when a special

relationship exists, such as that created by common carrier and passenger. The storekeeper and business invitee do not have that special relationship."). "[C]ommon carriers owe a duty to take affirmative action to protect their passengers from an assault by a third party if certain conditions are present." *Todd v. Mass Transit Admin.,* 373 Md. 149, 159, 813 A.2d 930, 935 (2003). "The existence of the duty depends, first, on whether the carrier, in the exercise of proper care, knew or should have known that an assault was imminent." *Id.*

In the instant case, there was no special relationship between plaintiffs and Defendants, nor was there a special duty to protect invitees at the Premises on the day of the occurrence. Plaintiffs incorrectly claim that the murder of Gladys Tordil and subsequent manhunt for Eulalio Tordil were highly publicized, as to support a conclusion that Defendants had actual notice of a heightened risk – this was not the case. There is no evidence that Tordil's license plate information had been released to the public prior to the day of the attack, nor is there any evidence that Montgomery County was on "high alert" as alleged in Plaintiff's Complaint. *See* Exhibit 3 to Plaintiffs' Request for Admissions, Exhibit G; *see also* Deposition Transcript of Defense Expert Jack Dowling, Exhibit H at 88:8–89:3; *see also* Deposition Transcript of Plaintiffs Expert David Levenberg, Exhibit J, at 23:5–21, 57:14–25. The articles relied upon by plaintiffs specifically state that Tordil's murder of his wife happened in Prince George's County and that it "appears to be domestic violence" or was "a fatal domestic-related shooting" and "at no time was this an active shooter situation." *Id.* In fact, articles published by WTOP and ABC7 on May 5, 2016, the day of the murder at High Point, stated that "school will start on time Friday" the following day, or May 6, 2016. *See id*. at pp. 94–97, 162, 165. An article published on May 6, 2016 by Fox 5 news conveys that police believed the shooter to have been driving a grey truck and "to have fled by foot." *Id.* at

p. 107. Another article from NBC Washington directly states that "[p]olice have not released a description of the Eulalio Tordil's vehicle that used to drive away from the scene." *Id.* at p. 137.

While it is true that these articles state that Tordil was at large, Defendants would have had no reason to be on actual notice of a heightened and unreasonable risk to mall visitors, as the articles characterized Tordil's murder as an act of targeted domestic violence, in another County, at a high school that was planning to resume its regular schedule the following day. *Id.* Under plaintiffs' logic, everywhere within eighteen hours driving distance should have been put on actual notice of a heightened risk, as no one could be sure exactly where Tordil was during that time. Following this logic would be to unfairly burden businesses with maintaining an almost constant high alert each and every time a crime is committed anywhere within this eighteen hour window until the criminal is caught or fear facing liability.

### 2. Defendants Did Not Owe a Duty to Protect Plaintiffs from the Occurrence Because There is No Evidence of Increased Similar Criminal Activity on the Premises that Made the Occurrence Foreseeable

Under Maryland law, if a storekeeper knows or should know of criminal activity on the Premises, the storekeeper has a duty to take "reasonable measures, in view of the existing circumstances, to eliminate the conditions contributing to the criminal activity." *See Scott*, 278 Md. at 169, 359 A.2d at 554[4]. The landlord's duty to exercise reasonable care for the safety of persons on the property:

> [A]rises primarily from criminal activities existing on the landlord's premises, and not from knowledge of general criminal activities in the neighborhood. . . . Since the landlord can affect the risk only within his own premises, ordinarily only criminal acts occurring on the landlord's premises, and of which he knows or should have known (and not those occurring generally in the surrounding neighborhood) constitute relevant facts in determining, in the particular

---

[4] In that the court directed Defendants to jointly file their motions for summary judgment, the arguments submitted to the court are largely lumped together. However, PSC submits that it does ***not*** have the same duties toward invitees to Montgomery Mall as the mall defendants/property owners. PSC's duties, which are non-existent as to plaintiffs herein, are addressed further below in section D.

circumstances, the reasonable measures which a landlord is under a duty to take to
keep the premises safe.

*Id.* The landowner must have knowledge of *increased* criminal activity *on the Premises* to trigger

this duty. *See Nails v. Community Realty Co.*, No. 97-1716, 1998 WL 879511 (4th Cir. 1998)

(applying Maryland law) *cited with approval by Moore v. Jimel, Inc.*, 147 Md. App. 336, 809 A.2d

10 (2002). Moreover, the landlord must have knowledge of "*similar criminal activity* – evidenced

by past events – occurring on the premises." *See Troxel v. Iguana Cantina, LLC*, 201 Md. App.

476, 497, 29 A.3d 1038, 1050 (2011). Thus, the past criminal activity must be of such a nature as

to make the type of criminal activity that occurred foreseeable. In describing the prior criminal

activity that may give rise to a duty, the Maryland Court of Appeals explained:

> A landlord's duty under *Scott* obligates the landlord to take reasonable security
> measures to eliminate harm that is foreseeable, <u>*based on the nature of the known*</u>
> <u>*criminal activity on the premises*</u>. On the other hand, <u>if the harm is not the sort of</u>
> <u>harm that a landlord of ordinary intelligence would associate with that criminal</u>
> <u>activity, the duty does not attach.</u>
> . . . .
> A landlord has a legal duty to take reasonable security measures within the common
> areas when: (1) the landlord has knowledge or should have had knowledge of
> criminal activity having taken place on the premises, and (2) <u>*a landlord of ordinary*</u>
> <u>*intelligence, based on the nature of the past criminal activity, should have foreseen*</u>
> <u>*the harm suffered.*</u>

*Hemmings v. Pelham Wood LLLP*, 375 Md. 522, 541, 826 A.2d 443, 457 (2003) (emphasis added).

In *Moore v. Jimel, Inc.*, the Court of Special Appeals found that a bar did not owe a duty

to protect its patrons against criminal activity on the Premises where there was no evidence of

similar criminal conduct. 147 Md. App. 336, 809 A.2d 10 (2002). In that case, Plaintiff alleged

that she was raped in the restroom of Defendant's bar, and that Defendant negligently failed to

provide adequate security. The Court of Special Appeals affirmed the lower court's grant of

summary judgment for Defendant, stating: "because there was no evidence of any prior crime

having been committed against a customer on the premises, there was no foreseeability of risk so

as to create a special duty in that regard." *Id.* at 349, 809 A.2d at 18. The Court cited with approval the decision of the Fourth Circuit Court of Appeals in *Nails v. Community Realty Co.*.

In *Nails*, the Fourth Circuit applied Maryland law to reject plaintiffs' claim that an apartment complex owed them a duty to protect them from criminal activity. No. 97-1716, 1998 WL 879511 (4th Cir. 1998). In that case, plaintiffs were near the entrance to the apartment complex when a man robbed them at gunpoint, locked one of plaintiffs in the trunk of his car, and murdered the other plaintiff. Plaintiffs presented evidence that just *four months prior* to the incident, another person was robbed at knifepoint. *Id.* at *2–4 (emphasis added). The District Court concluded that "this sole instance of violent criminal conduct [was] insufficient, as a matter of law, to create a duty for [the apartment complex] to provide all night security." *Id.* at *4–5. The Fourth Circuit agreed, finding that a solitary robbery is not sufficient to put "a landlord on notice of increasing criminal activity on the Premises sufficient to give rise to a legal duty to protect against armed robbers on the premises." *Id.* at *6. *See also*, *Smith v. Dodge Plaza Ltd. Partnership*, 148 Md. App. 335, 346, 811 A.2d 881 (2002) (holding that evidence of two prior **similar** crimes were "legally insufficient, in and of themselves, to have put [the owner] on constructive notice of a danger to patrons of criminal injury within [the nightclub] beyond that normally encountered in urban society."); *Bias v. IPC Int'l Corp.*, 1997 U.S. App. LEXIS 3913 (4th Cir. 1997)(holding that store owner was not on notice that a customer might be shot even though there were alleged to have been prior robberies in the store, because the notice must make the store owner aware of a threat that the particular assailant poses to the particular victim); *Nigido v. First Nat'l Bank of Baltimore*, 264 Md. 702, 704, 288 A.2d 127, 128 (1972) (holding that former robberies may have made future robberies foreseeable, but they did not place defendant on notice that a customer may be shot).Unlike in *Nails*, where the robbery took place just four months before Tordil's attack, the

only evidence of any somewhat similar criminal activity in this case is an alleged stabbing which occurred approximately three years before the attack, in a different parking lot on the other side of the mall. *See* Ex. D, at 102:12–20; 104:3–11 (Todd Hiepler testified that he was only aware of one incident occurring in the vicinity of the Premises in the five years prior to the occurrence involving violence). There were no prior violent and/or similar incidents reported in the Macy's parking lot at the mall in the five years preceding the occurrence. *See* Ex. F, at 39:16–40:9. Finally, there were also no known pre-incident actions by Tordil at the Premises that would indicate that the shooting would occur until the incident actually happened. *See* Expert Report of Jack Dowling, Exhibit H, at p. 6. The lone stabbing, approximately three years prior to the occurrence, is insufficient as a matter of law to put Defendants "on notice of *increasing* criminal activity on the premises sufficient to give rise to a legal duty to protect against [criminal activity] on the premises." *See Nails*, No. 97-1716, at *6. Stated simply, the alleged stabbing three years prior in another mall parking lot, did not make the fatal shooting in the Macy's parking lot three years later foreseeable.

### 3. Tordil's Domestic-Related, Targeted School Shooting was Not an Imminent and Foreseeable Threat to Support a Legal Duty

Where a third party creates the dangerous condition, "a proprietor may be liable if it has actual notice and sufficient opportunity to either correct the problem or warn its other customers about it." *Rehn v. Westfield America*, 153 Md. App. 586, 837 A.2d 981 (2003). In *Rhaney v. Univ. of Md.*, plaintiff's claim of negligence was based on a theory that knowledge possessed by the landlord/invitor with respect to prior conduct of the assailant allegedly made the resulting attack on him from his roommate Clark foreseeable and preventable. 388 Md. 585, 589, 880 A.2d 357, 359 (2005). However, despite the assailant's prior conduct, the Court held that it was not foreseeable by the University that a student would assault his roommate in their shared dormitory, even though that student had been suspended for two prior assaults. *Id.* at. 603, 880 A.2d at 368.

In so holding, the Court stated that there was "no pattern of sufficient prior violence on Clark's part in circumstances similar to what ultimately happened to Rhaney, [so] UMES could not be said to be responsible for reasonably foreseeing what happened and, therefore, to have a duty to forestall its occurrence or stand liable for the consequences." *Id*. There was no evidence Clark had ever assaulted or threatened to assault any of his roommates, and criminal history was isolated to events happening off campus. *Id.* at 600, 880 A.3d at 366.

In the instant case, Plaintiffs allege that Defendants should have been put on notice of a pending attack by Tordil based on his murder of his wife the previous day. However, there is no evidence that Tordil had ever assaulted or shot any members of the public outside of the domestic-related attack the day prior. There is no evidence that Tordil had been involved in any encounters or pre-incident actions on the subject Premises. The incident against his wife was targeted, directed, premeditated and intentional, with no known connection and/or link to the mall. Further, a domestic-related, targeted shooting that occurred over eighteen hours earlier, fifteen miles away in another County, is not an imminent and foreseeable threat that would have generated notice to or created a duty on the part of Defendants. It would be unreasonable and cost prohibitive for businesses to be considered as put on notice of a pending attack every time a crime occurs in a neighboring county or city. Tordil's license plate was scanned in northern Maryland and again in Virginia. Following that line of logic, every business in Maryland, Virginia and the District of Columbia should have been on high alert due to the illogical possibility that Tordil may have remained in the area, and may have attempted to attack patrons on business property.

After the targeted attack, Tordil fled the scene of the crime and was tracked via license plate readers to the Frederick, Maryland and Virginia areas, over thirty miles away from the mall. The police had not released information about Tordil's license plate or the type of vehicle he was

fleeing in. If anything, the news articles covering his initial murder provided conflicting information as to how he fled, and what type of vehicle he was driving. There was no detailed warning released to the public that Tordil would be a danger to Montgomery County residents aside from general news articles articulating that he was on the run. Further, Tordil was not considered to be a reasonably foreseeable and imminent threat to the Montgomery County Police Department, and as such there was no warning issued to Defendants to alert them of a need for heightened security. *See* Deposition Transcript of Jack Dowling, as <u>Exhibit I</u>, at 87:22–89:8; *see also* <u>Ex. B</u>, at 28:11–17. If anything, a logical person would be expected to flee as far from the scene of the crime as possible to lower their chances of getting caught. Here, Tordil did not act consistently with how a logical criminal would be expected to act, by driving for eighteen hours only to return to the area and enhancing his likelihood of capture.

**B.  Defendants are Entitled to Summary Judgment Because Defendants Did Not Breach Any Duty Owed to Plaintiffs**

Assuming, arguendo, that Defendants did owe a duty, there are no facts to support an inference that Defendants breached the duty. Under Maryland law, the duty owed by a possessor of land to protect against foreseeable criminal conduct is "to take reasonable measure, in view of the existing circumstances, to eliminate the conditions contributing to the criminal activity." *See Scott,* 278 Md. at 169, 359 A.2d at 554. The Court of Appeals in *Rhaney* explained the scope of the landlord's duty under the precedent of *Scott* as follows:

> In *Scott*, we held that a landlord had a duty of reasonable care to its tenants where the landlord had knowledge of criminal activities occurring within the common areas of the premises. <u>We did not state, nor imply, however, that such criminal acts occurring in the common areas themselves constituted a "dangerous or defective condition." We did not make the landlord an insurer of its tenants against these criminal acts</u>; rather, a landlord has a duty to "take *reasonable* measures, in view of the existing circumstances to eliminate those *conditions* contributing to the criminal activity.

388 Md. at 599–600, 880 A.2d at 365 (internal citations omitted) (emphasis added). Thus, even if Defendants owed a duty in this case, the duty was not to protect plaintiffs against criminal activity, but rather to eliminate the conditions that "contributed to or facilitated" the criminal activity.

For example, in *Hemmings v. Pelham Woods, LLLP*, the Court of Appeals found that a landlord could be responsible for criminal activity inside of a tenant's apartment where the criminal activity was facilitated by conditions in the common areas. 375 Md. 522, 826 A.2d 443 (2003). In that case, an armed burglar entered plaintiff's apartment through the rear sliding glass door and shot Plaintiff twice. *Id*. at 528, 826 A.2d at 447. Plaintiff presented evidence that in two years prior to the occurrence, there were twenty-nine (29) burglaries or attempted burglaries and two armed robberies on the premises. *Id.* at 530, 826 A.2d at 448. There was also testimony that the lighting at the rear of the premises was insufficient and that one robbery and several burglaries involved an intruder entering through the rear sliding glass door where the lighting was inadequate. *Id.* at 530–31, 826 A.2d at 448. There was also evidence that the Plaintiff's apartment was previously burglarized by a criminal entering through the rear sliding glass door. *Id.*

In order to hold that Defendants breached a duty to protect plaintiffs against foreseeable criminal conduct, the Court must find that there existed a dangerous condition on the Premises, that Defendants knew about the dangerous condition, that Defendants knew of increased criminal activities on the Premises, knew that the dangerous condition contributed to increased criminal activity, and failed to eliminate the condition contributing to the criminal activity. Here, there is no evidence whatsoever of any dangerous condition that contributed to or facilitated any criminal activity on the Premises. There is no evidence that the prior single stabbing incident was facilitated by a condition of the Premises. Moreover, this occurrence happened in broad daylight, in a crowded parking lot which was being actively patrolled by PSC security guards, in the presence

of many potential witnesses including a police officer in a marked vehicle on the Premises, fifty yards away from the scene of the crime. PSC had seven guards on duty on May 6, 2016, with a guard and a trainee actively patrolling the parking lot immediately prior to the attack. *See* Ex. D, at 30:20–32:13. There was also a large easily-visible security camera installed on the corner of the Macy's building adjacent to the parking lot where the shooting occurred. *See* Ex. F, at 31:5-10. Thus, there is no evidence of any conditions on the Premises that were contributing to the criminal activity of which Defendants were aware, and which Defendants failed to remediate. As will be further stated *infra*, plaintiffs' expert fails to come to any conclusions regarding the appropriate standard of care for the Mall or PSC Defendants and cannot state exactly how any standard was violated. Thus, plaintiffs are unable to prove their case without delineating a standard of care and offering expert opinion as to how it was breached.

**C.    Defendants are Entitled to Summary Judgment Because Defendants Were Not the Proximate Cause of Plaintiffs' Injuries**

It is well established law in Maryland that "[n]egligence is not actionable unless it is a proximate cause of the harm alleged." *Stone v. Chicago Tile Inc. So.*, 330 Md. 329, 624 A.2d 490 (1993). To be a proximate cause, the negligence must be: (1) a cause in fact, and (2) a legally cognizable cause. *See Troxel,* 201 Md. App. at 505, 29 A.3d at 1055. In the context of third-party criminal conduct on the premises, the test for cause in fact is whether the defendant's conduct "was a substantial factor in producing Plaintiff's injuries." *Id.* at 504–05, 29 A.3d at 1055. In assessing whether the negligence is a legally cognizable cause, the Court considers whether the harm suffered by plaintiffs was foreseeable and whether there were unforeseen intervening acts. *Id.* at 505, 29 A.3d at 1055.

**1.    Defendants were Not the Cause in Fact of Plaintiffs' Injuries**

Here, there is no evidence that Defendants were a substantial factor in producing plaintiffs' injuries. In fact, there is no evidence that Defendants were a factor in causing the attack at all. Plaintiff Carl Unger testified that he parked his vehicle in the mall parking lot at the mall "every Friday" to get lunch at the food court with Mike Winffel. *See* Ex. A, at 56:16–18. It may be gathered from this testimony that the men did not feel insecure or unsafe in the parking lot, as if this were the case, it is doubtful the men would continue to frequent the premises weekly. Further, the entire attack took place in a matter of minutes. Mr. Unger testified that "everything happened so fast" and that the police were "there so quick." Ex. A, at 69:11–12. Defense Expert Jack Dowling also states in his report that the occurrence was unpreventable, due to the sudden and short duration of the event, and the lack of foreseeability of the attack. Ex. H, at p. 4. Police and security were on the scene moments, if not seconds, after this entirely unpredictable attack occurred. *See* Ex. B, at 45:19–46:22. There is simply no evidence that there was any condition on the premises that would point to Defendants as being a cause in fact of plaintiffs' injuries.

## 2. Defendants were Not the Legally Cognizable Cause of the Occurrence

In assessing whether the condition of a premises is a legally cognizable cause of third-party criminal conduct, the Court has adopted the "enhanced risk" theory. This theory provides that "[a] breach of a duty by the defendant would result in his liability in the third-party criminal activity context *only if the breach enhanced the likelihood of the particular criminal activity which occurred.*" *See Scott*, 278 Md. at 173, 359 A.2d at 556 (emphasis added). Moreover, the Court has stated that the criminal act of a third party is a superseding cause of harm unless the negligent actor, "at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created and that a third person might avail himself of the opportunity to commit such a tort or crime." *Id.* at 172–73, 359 A.2d at 556 (citing Restatement (Second) of Torts

§ 448); *see also Tucker v. KFC Nat'l Mgmt. Co.*, 689 F. Supp. 560, 564 (D. Md. 1988), *aff'd* 872 F.2d 419 (4th Cir. 1989).

Here, there is no evidence of any condition on the premises that enhanced the likelihood that Tordil would enter the premises, attempt to steal a car, and shoot innocent bystanders. At the time of the attack, there were seven PSC guards on duty at the mall. *See* <u>Ex. D</u>, at 30:20–31:3. Two PSC personnel were patrolling the premises in a marked security vehicle with flashing yellow lights on the roof. *Id.* at 32:4–13. There was also a Montgomery County police officer, David Kocevar, in a marked police cruiser with a lightbar, parked in the Macy's parking lot approximately fifty yards from where the attack took place. *See* <u>Ex. A</u>, at 41:15–16; 42:11–13; 56:9–13. The cruiser was in plain view and not obscured by hedges or barriers. *See id.* at 81:17–19. In fact, Mr. Unger has testified that he noticed Kocevar's cruiser by simply glancing to his left when pulling into the parking lot. *Id.* at 59:15–20. As an added security feature, there was a large domed security camera on the corner of the Macy's store roof that was plainly visible from the parking area where the incident took place. <u>Ex. H</u>, at p. 5. Not only is there no evidence of any condition on the premises that enhanced the likelihood of the incident, but there is ample evidence of security measures and deterrents designed to prevent any such criminal activity from taking place. As such, Defendants were not the proximate cause of the injuries sustained by plaintiffs as there was no reason for Defendants to know that Tordil would commit an unprovoked shooting on the Premises, thus Tordil's criminal act was the superseding cause of the injuries alleged.

**D. PSC[5] Did Not Stand In a Special Relationship to Plaintiffs and Would Have Had No Duty to Act to Prevent Tordil from Injuring Plaintiffs Even if Such a Duty Existed.[6]**

---

[5] Although Professional Security Concepts, Inc. has no business remaining a defendant in this case, it adopts the arguments raised in this section as its own given that plaintiffs continue to pursue it as if it had something to do with the Premises at issue.

[6] The arguments raised in this section as to why PSC had no duty to act are equally applicable to the mall Defendants and are adopted on their behalf.

Generally speaking, "a private person is under no special duty to protect another from criminal acts by a third person, in the absence of statutes, or of a special relationship." *Scott,* 278 Md. at 166, 359 A.2d at 552 (*citing [Restatement of Torts (Second) § 315](#)* (1965) (no duty to control third person's conduct so as to prevent physical harm to another unless a special relation exists between actor and third person, or between actor and the other). Special relationships arise only in narrow circumstances. *Durden v. United States*, 736 F.3d 296, 304 (4th Cir. 2013).

Under Maryland law, there is no statute which plaintiffs can point to for the proposition that PSC was under an obligation to protect them from criminal acts of third-parties. Thus, they would have to rely upon caselaw to establish that a special relationship exists between a security company and a patron to a premises at which the security company performs services. There is no such caselaw in Maryland, and in light of the fact that this circuit ascribes to the position that special relationships arise only in narrow circumstances, this court should refrain from expanding the law to create a special relationship which has not heretofore been recognized.

However, even if the court were to find that PSC stood in a special relationship to plaintiffs, it had no duty to protect plaintiffs from Tordil's vicious and heinous assault upon the mall patrons. A case on point, *Jackson v. AMF Bowling Ctrs., Inc.*, 128 F. Supp. 2d 307 (D. Md. 2001), amply demonstrates this.      In *Jackson*, the plaintiff attended an event at a bowling alley which had been rented by the event sponsor. The event sponsor contracted with the bowling alley for use of its space and agreed it would have twenty security guards on duty at the event. The sponsor breached that agreement, cancelling six of the twenty security guards. Plaintiff arrived at the event and was searched for weapons, as were other patrons. At some point, an altercation broke out between a number of patrons, and plaintiff was stabbed. After he was stabbed, security broke up the fight and asked plaintiff, among others, to leave the premises. Plaintiff had not, as of that time, advised

anyone he was injured, nor was his injury apparent. Plaintiff claims that he was afraid to leave the premises, fearing his assaulters were outside, yet he was forced out. He was then re-assaulted by the same persons before being able to break away and obtain medical care. Plaintiff sued, claiming that defendant breached its duty of heightened and general care to him. The court disagreed, dismissing all claims. In doing so, the court stated:

> In *Southland*, [332 Md. 704 (1993), the Court of Appeals of Maryland expressly adopted the duty of care owed to a business invitee as provided in § 314 A of the Restatement (Second) of Torts, and held that:
>
>> An employee of a business has a legal duty to take affirmative action for the aid or protection of a business invitee who is in danger while on the business's premises, provided the employee has knowledge of the injured invitee and the employee is not in the path of danger.
>
> *Id.* at 719, 633 A.2d at 91. The duty to protect . . . [a plaintiff] against unreasonable risk of harm extends to risks arising out of a defendant's conduct or the intentional criminal acts of third parties. *Restatement (Second) of Torts § 314 A* cmt. d. Defendant is not required 'to take precautions against a sudden attack from a third person which he has no reason to anticipate…." *Id.* cmt. e. He is only required to act when he knows or has reason to know **that the plaintiff** is in danger or injured. *Id*. cmt. f. A defendant and/or its employees are only required to take action that is reasonable under the circumstances. *Id.* Thus, an employee need only offer assistance if in doing so, he is not endangering himself. *Southland*, 332 Md. At 719, 633 A,2d at 91. (emphasis added).

The *Jackson* court, applying the aforementioned law, held that plaintiff could not state a *prima facie* claim because he had set forth no facts to establish that defendant knew "**he, in particular,** would be a victim of a criminal act…." *Jackson,* 128 F. Supp. 2d at 312 (emphasis added). Rather, the most that the guards knew was that plaintiff was one of the persons involved in the initial fight involving a number of people. The court went on to state that:

> [t]he illustrations in § 314 A of the Restatement (Second) of Torts make clear that in order for the heightened duty to be imposed, the defendant must know or have reason to know that **the plaintiff** was endangered or injured. *See id.* cmt. f., illus. 1 (defendant's employees discover plaintiff has fallen off a train and fail to send aid or tell others); illus. 2 (train crew discover that plaintiff is unconscious yet fail to call for medical help because they assume unreasonably he is drunk); illus. 3 (fire breaks out in defendant's hotel, and his employees fail to call and warn plaintiff, a guest, to leave); illus. 4 (defendant's employees see that

child in department store has his fingers caught in an escalator, but delay in shutting off the escalator); illus. 5 (plaintiff has a heart attack and specifically asks for a doctor, defendant's employees fail to summon medical care, or to move plaintiff to where he can receive such care); . . . . (emphasis added).

*Jackson*, 128 F. Supp. 22 at 312.

The *Jackson* court held, that in the absence of facts to suggest that defendant knew of a particularized harm directed at plaintiff, plaintiff could not establish defendant had a duty to aid or protect him from criminal acts of a third-party. Such a duty simply did not arise.

In the instant case, there is no evidence that PSC knew that plaintiffs, "in particular," would be the victim of a criminal act or were in imminent danger. The facts are actually quite to the contrary. Tordil came to Montgomery Mall, where he approached a woman in the parking lot, presumably in an effort to steal ***her*** car. The woman fled in the direction of Malcolm Winffel and Carl Unger. As the woman ran toward the men, Tordil shot them, resulting in the death of Mr. Winffel and serious injury to Mr. Unger. To the extent that anyone was the target of Tordil, it was the woman whose car Tordil allegedly wished to steal. Putting aside the fact that PSC could not have anticipated that even she would be the victim of Tordil's criminal act, certainly there are no facts to suggest that PSC knew or should have known that plaintiffs were about to become the victims of Tordil's criminal act. Without being able to establish that PSC knew or had reason to know that these particular plaintiffs were in danger of Tordil's impending murder and attempted murder of plaintiffs, PSC had no duty to act.

Finally, PSC submits that it had no duty to act to protect plaintiffs against Tordil because its employees are: (a) only required to take action that is reasonable under the circumstances; and (B) need only offer assistance if in doing so, they are not endangering themselves. Here, had PSC's unarmed employees, who did not so much as carry mace or a baton, encountered Tordil brandishing a gun, they would not have had a legal obligation to intervene. To do so would have

resulted in them endangering themselves in an effort to safeguard the mall's patrons. While such an action would certainly be heroic, much as Officer Kocevar's actions were on the day of the shooting, it would not have been legally required. Without a legal duty to act, PSC cannot be found liable to plaintiffs under any theory of law.

E. **Defendants are Entitled to Summary Judgment because Plaintiffs' Expert David Levenberg's Proffered Opinions Fail the *Daubert* Prongs of Reliability and Relevance**

1. **Factual Background**

Plaintiffs designated David Levenberg to testify as an expert in the field of security and security risk analysis for malls and large shopping centers. Defendants expect that Levenberg will offer four opinions at trial: (1) Defendants failed to take reasonable measures to stay informed of local news developments and dangerous activity in Westfield Montgomery mall's surrounding areas; (2) Defendants failed to take reasonable measures to deter Tordil from entering the mall's Premises and shooting patrons; (3) Defendants failed to take reasonable measures to identify and report Tordil as a foreseeable danger to mall customers; and (4) Defendants failed to take reasonable measures to adequately monitor the area of the shooting and prevent the shooting.

Levenberg has no professional licensure relevant to security and has never done any security patrol work as his primary job responsibility. *See* Ex. J, 13:19–21; 15:15–17. Despite his professional background and designation, Levenberg admits that he did not consult or rely on major professional publications in conjunction with the opinions he has drawn in this case, and that he has never read the entire ASIS General Risk Assessment Guidelines, though ASIS is a "pretty well-respected organization." *Id.* at 24:4–11; 24:24–25; 85:23–86:4. Levenberg also admits that he did not follow the methodology of the International Association of Professional Security Consultants in coming to his conclusions in this case. *Id.* at 25:24–27:6. Instead of following these

well-known industry standard guidelines, when asked what methodology he used in rendering his

opinions Mr. Levenberg states:

> Q:     What methodology did you use?
> A:     I used - - my experience in doing this for as many years as I've been doing
> it, pieces of that, pieces of other risk assessment methodologies that - -
> again, reviewing data, looking at historical data, looking at existing
> operation, manpower, staffing, deployment, equipment, those kind of
> things.

*Id.* at 27:7–14.

Levenberg opines that the best practices for security standards are based upon the "trade

area" of the shopping center and the changing trends within that trade area – whether it be changes

in criminal activity, age groups, income levels, governmental issues, and police or first responder

staffing. *Id.* at 32: 1–10. He defines "trade area" as the area from which customers come to shop

and how frequently they shop. *Id.* at 33:9–11. Despite his reliance on the importance of a "trade

area" in developing a security plan, just one page later Levenberg admits that he did nothing to

investigate what the trade area for the shopping center actually is:

> Q:     Did you do anything to investigate whether, in fact - - what, in fact, the trade
> area for the shopping center is?
> A:     No.
>
> Q:     Did you do anything to familiarize yourself with the crime statistics for
> Montgomery County?
> A:     No, I did not get any of that information.
>
> Q:     Did you do anything to determine whether there had been any reduction in
> police staffing or first responders?
> A:     No.
>
> Q:     Did you do anything to determine whether there were any issues related to
> local government as you referred to?
> A:     No.
>
> Q:     Did you do anything to investigate the income level of Montgomery County
> and the surrounding areas?
> A:     No.

Q: Did you do anything to investigate whether there were changing age groups, as you referred to?

A: No.

*Id.* at 33:25–31:4.

Though admittedly doing nothing to investigate the "trade area" and stating that he does not "know specifically" what the trade area is, Levenberg opines, based on his self-imposed definition of a trade area being where customers come to a shopping center from, that it could be almost the entire state of Maryland, and that it "probably encompasses parts of the District of Columbia, it may encompass parts of Virginia". *Id.* at 36:6–22; 92:6–16. Thus, he is of the opinion that had Defendants taken reasonable measures to stay informed of local developments and dangerous activity in the "trade area," Defendants would need to adjust their security measures every time a crime was committed in at least most of the state of Maryland, and possibly parts of D.C. and Virginia. However, Levenberg cannot provide any support for his opinion of what the "trade area" for the mall is, and what reliable methodology he used to come about the exact geographical area that Defendants should have been monitoring.

Next, Levenberg opines that Tordil posed an imminent and foreseeable harm to mall customers. *Id.* at 37:17–25. He bases his opinion in regards to foreseeability on the fact that Tordil shot his wife the day before, at a location fourteen (14) miles away, in an adjacent county. He also bases his opinion on the fact that the murder was on the local news, and that the shopping center was near a major highway and that "the guy's driving around on the loose, nobody knows where he is, there's a good likelihood that he may end up at the property because he's probably going to try to change vehicles." *Id.* at 39:8–11. However, he offers no reasoning as to why Tordil wouldn't have chosen to show up at any other shopping center other than Montgomery Mall, specifically a

shopping center in Prince George's County, where he killed his wife. When asked, he simply says: "He could have. We don't know that." *Id.* at 39:22.

Further, as for foreseeability, Levenberg admits that he has no knowledge of and has done no research as to how often people who commit domestic violence then escalate that violence to randomly commit crimes against others. *Id.* at 41:4–9. He also admits that he has no facts to form the basis of his opinion that Tordil's intent to carjack someone following the murder of his wife should have been foreseeable by Defendants.

> Q:     And do you factually know of anybody who understood or knew that Mr. Tordil was going to try to carjack someone prior to the incident at the mall? Are you aware of anybody being aware of that?
> A:     I don't believe he talked to anybody before he did what he did, so no.
>
> Q:     Do you have any facts to suggest that at the time he arrived at the mall, it was his intent to carjack someone?
> A:     No, but *common sense* would - - would dictate that if I'm trying to stay under the radar, I mean he - - he - - it was talked about in his pretrial information that he knew that - - or in his interview of the detective, that police could track his cell phone, which is why he turned it off, that he also thought that they could track the vehicle that he was in. And if those were - - the case, then he would normally - - or anybody would normally want to change vehicles.

*Id.* at 41:11–42:5 (emphasis added). Levenberg also states in his deposition that even if the mall security had known of Tordil's crime the day before, there are no facts to suggest that they would have seen him come into the parking lot. *Id.* at 42:21–43:2. Though he opines that had Defendants been monitoring the news and been aware of the situation, including the vehicle description or his description, they could have notified the police of his presence on the property. However, he incorrectly bases his opinion as to the identification of the car on the misinformation that a car description and/or license plate number had been released prior to the parking lot shooting when in actuality, no such information had been released to the public. *Id.* at 44:12–15, 57:14–20, 58:20–22; *see also* Ex. H, at p. 7.

Levenberg offers the opinion in his report that: "Malls the size of the Westfield mall that exercise reasonable care in their security practices keep themselves aware of dangers and crimes that have occurred or are occurring in their community or surrounding areas. *See* Expert Report of David Levenberg, Exhibit K, Subsection A. However, when asked about this opinion, Levenberg could not identify a written standard that supports this opinion, just that it is "best practice in the industry". Ex. J, at 85:3–5.

Levenberg goes on to opine that the PSC Defendants had misplaced reliance on the local police department to inform them of imminent threats to the mall. Again, instead of relying on industry standards, he states that this opinion is based on: "Experience. Common sense. [but that] it's not the police department's job to notify every private business in a community of everything that's going on." Ex. J, at 46:15–18. However, when asked if he knew what the relationship between the PSC Defendants and the Montgomery County Police Department was, aside from being aware of monthly meetings between the agencies, he drew a blank.

> Q: And do you know whether the relationship was such that the police would inform the mall if they had any concern of an impact on the mall?
> A: I - - I couldn't tell you. I mean, I'm - - again, *I'm assuming*, that because they met monthly, that the police department would inform the security director of activity in the area that might spill over, or let - - let's say for - - common type of thing is that the police notice an increase in auto thefts or auto burglaries, for example, in the community, and they track it by precinct or district, and if they see things moving towards the shopping center, for example, then that's part of the discussion at these meetings, and - - and they discuss a tactic to address that, can we get plain-clothed officers or unmarked car on the property to - - to keep an eye out for auto thieves or auto burglars. . .
>
> Q: Do you know whether the Montgomery County police department was actively looking for Mr. Tordil at the time leading up to the mall shooting?
> A: I don't know that for sure, no.

*Id.* at 47:13–16. Not only was he not aware of the nature of the relationship between the PSC Defendants and the Montgomery County Police Department, as he acknowledges his opinion of

such is based on assumption alone, he also cannot definitively say if the Montgomery County police department was actively searching for Tordil at the time immediately prior to the shooting. *Id.* Yet, despite this lack of foundation, he opines that Defendants should have foreseen Tordil's imminent attack on their patrons, based on "common sense" that he would enter the parking lot that day in order to attempt to carjack a vehicle.[7] Finally, when asked whether he had conducted an assessment of what he would believe to be adequate, reasonable, security presence at the mall, Levenberg could not answer as he did not conduct any assessment to opine on the standard of care.

> Q: Did you conduct an assessment of what you believe to be adequate security presence at this particular retail establishment to be, irrespective of the shooting?
> A: No.
> . . .
>
> Q: But my question is, did you undertake your own analysis to determine whether two [patrol vehicles] was appropriate?
> A: No.

*Id.* at 77:14–18; 78:7–10.

Levenberg does opine that Defendants should have had closed-circuit television surveillance in the parking lot, or in lieu of security cameras, that the PSC Defendants should have had a protocol that required officers to pay special attention to the areas without surveillance, or "blind spots." *Id.* at 80:12–20. However again, this opinion is not based on any industry standard or accepted methodology within the security industry. Levenberg himself states: "it's not a standard, but it - - *again* - - it's kind of common sense." *Id.* at 80:23–24 (emphasis added); *see also id.* at 83:8–10. Essentially, this is another example of Levenberg's reliance on his own assumptions and "common sense" to form the basis of his opinions in this matter, rather than reliable methodology such as that set forth by the ASIS General Security Risk Assessment Guideline.

---

[7] As an aside, if Levenberg's opinions are, as he repeatedly stated, based on "common sense," a jury does not require testimony from a purported expert on the topics about which Mr. Levenberg has been offered.

## 2. Argument

Federal Rule of Evidence 702, which governs the admissibility of expert opinion states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b)     the testimony is based on sufficient facts or data;
(c)     the testimony is the product of reliable principles and methods; and
(d)     the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc*, the Supreme Court set forth a two-part test that must be met in order for expert testimony to be properly admitted under Rule 702: the testimony must be both reliable and relevant. 509 U.S. 579, 589, 113 S. Ct. 2786, 2795 (1993) ("[U]nder the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."). While *Daubert* dealt with "scientific" testimony, the Supreme Court in *Kumho Tire Co., Ltd. v. Carmichael*, *supra*, clarified that the trial court's "gatekeeping" obligation applies not only to scientific testimony, but to all expert testimony. 526 U.S. 137, 138, 119 S. Ct 1167, 1169 (1999). In *Westberry v. Gislaved Gummi AB*, 178 F.3d 257 (4th Cir. 1999), the court examined the two-prong test annunciated in *Daubert*.

The first prong of this inquiry necessitates an examination of whether the reasoning or methodology underlying the expert's proffered opinion is reliable – that is, whether it is supported by adequate validation to render it trustworthy. The second prong of the inquiry requires an analysis of whether the opinion is relevant to the facts at issue. Thus, an expert's testimony is admissible under Rule 702 if it "rests on a reliable foundation and is relevant."

*Id.* at 260 (internal citations omitted).

"The inquiry to be undertaken by the district court is 'a flexible one' focusing on the 'principles and methodology' employed by the expert, not the conclusions reached." *Id.* at 261. However, "conclusions and methodology are not entirely distinct from one another." *General Elec.*

*Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 519 (1997). "A district court considering the admissibility of expert testimony exercises a gate keeping function to assess whether the proffered evidence is sufficiently reliable and relevant." *Westberry*, 178 F.3d at 261.

In determining whether reliability of proffered testimony meets the first prong of the test, "the court has broad latitude to consider whatever factors bearing on validity that the court finds to be useful." *Id.* Factors the court may consider are: (1) whether the reasoning or methodology underlying the expert's opinion has been or could be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error of the method used or standards controlling the technique's operation; and (4) the level of acceptance of the reasoning or methodology by the relevant professional community. *See id.*; *Daubert* 509 U.S. at 593–94, 113 S. Ct. at 2797; *Kumho*, 526 U.S. at 149, 119 S. Ct. at 1175.

While the above factors are the ones most referenced by the federal courts, they are not the only factors to consider. The Advisory Committee has noted that courts both before and after *Daubert* have found other factors relevant in determining whether expert testimony is sufficiently reliable to be considered by the trier of fact. These factors include:

> (1) Whether experts are "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1317 (9th Cir. 1995).

> (2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion. *See General Elec. Co. v. Joiner,* 522 U.S. 136 [139 L. Ed. 2d 508], 146 (1997).

> (3) Whether the expert has adequately accounted for obvious alternative explanations. *See Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1994).

> (4) Whether the expert "is being as careful as he would be in his regular professional work outside his paid litigation consulting." *Sheehan v. Daily Racing Form, Inc.,* 104 F.3d 940, 942 (7th Cir. 1997). *See Kumho Tire Co. v. Carmichael*, [143 L. Ed. 2d 238,] 119 S. Ct. 1167, 1176 (1999).

(5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give. *See Kumho Tire Co. v. Carmichael*, [143 L. Ed. 2d 238,] 119 S. Ct. 1167, 1175 (1999).

Fed. R. Evid. 702 Advisory Committee's Note.

Rule 702 "rejects the premise that an expert's testimony should be treated more permissively simply because it is outside the realm of science. An opinion from an expert who is not a scientist should receive the same degree of scrutiny for reliability as an opinion from an expert who purports to be a scientist." Fed. R. Evid. 702 Advisory Committee's Note. Specifically, "[i]t seems exactly backwards that experts who purport to rely on general principles and practical experience might escape screening by the district court simply by stating that their conclusions were not reached by any particular method or technique." *Watkins v. Telsmith, Inc.,* 121 F.3d 984, 991 (5th Cir. 1997). "The trial courts' gatekeeping function requires more than simply 'taking the expert's word for it . . . [t]he more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable." Fed. R. Evid. 702 Advisory Committee's Note. *See also O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090 (7th Cir. 1994) (expert testimony based on a completely subjective methodology held properly excluded).

In determining whether the proffered expert opinion meets the second prong of the test, that is, whether the evidence will be helpful to the trier of fact, the Court must be mindful that expert evidence can be both "powerful and quite misleading" and "given the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead than to enlighten should be excluded." *Westberry*, 178 F.3d at 261. Further, the court recognizes:

[T]hat in practice, a gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations. That nevertheless, is the balance that is struck by the Rules of Evidence designed not for the exhaustive search for cosmic understanding by for the particularized resolution of legal disputes.

*United States v. Dorsey*, 45 F.3d 809, 814 (4th Cir. 1995) (quoting another source).

"In determining whether a particular expert's testimony is sufficiently helpful to the trier of fact to warrant admission into trial, the district court should consider whether the testimony presented is simply reiterating facts already 'within the common knowledge' of the jurors;" something that can be done by the jury without the help from an expert. *Id.* at 814, 815 (citing *U.S. v. Harris*, 995 F.2d 532 (4th Cir.1993)). In addition, the proffered expert testimony must "go beyond mere speculation and conjecture to be of assistance to the trier of fact." *Oglesby v. General Motors Corp.*, 190 F.3d 244 (4th Cir. 1999).

Further, a court need not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert [where there is] simply too great an analytical gap between the data and the opinion proffered." *Pugh v. Louisville Ladder, Inc.*, 361 Fed. Appx. 448, 454 n.4 (4th Cir. 2010); accord *Alevromagiros v. Hechinger Co.*, 993 F.2d 417, 421 (4th Cir. 1993) ("[The expert witness] testified to no customs of the trade, referred to no literature in the field, and did not identify the reasonable expectations . . . we are unprepared to agree that 'it is so if an expert says it is so.'") (citation omitted). "Expert testimony rooted in subjective belief or unsupported speculation does not suffice." *Zuckerman v. Wal-Mart Stores E., L.P.*, 611 Fed. Appx. 138, 138 (4th Cir. 2015) (quoting *Daubert.*, 509 U.S. 579, 590 (1993)) (internal quotation marks omitted); *see also Wood v. Toyota Motor Corp.,* 134 Md. App. 512, 760 A.2d 315 (2000) (expert properly excluded when the proffered testimony did not pass standards similar to those enunciated in *Daubert*, and rejecting proffered testimony based upon nothing more than "because I say so.").

   a. **David Levenberg's Proffered Opinions Fail the *Daubert* Prongs of Reliability and Relevance**

In order to satisfy the reliability prong of *Daubert*, Mr. Levenberg's proffered opinions must be supported by an adequate factual basis which is then applied to accepted methods and reasoning. Here, Mr. Levenberg lacks a sufficient factual basis to support his opinion that Defendants had a crime-foreseeability duty expanding out into almost the entire state of Maryland, and portions of the District of Columbia as well as Virginia. As outlined above, he admits that he did nothing to investigate the "trade area" of the Montgomery Mall, however he considered High Point High School to be part of that trade area that Defendants should have reasonably been monitoring. He further admits that he has done no research into the propensity of domestic attackers to go on to commit violence to members of the general public, he can assert no factual basis to form his opinion that it was foreseeable that Tordil would attempt to carjack a vehicle at the mall, and though he opines that Defendants' reliance on the Montgomery County Police Department for information regarding increased alerts in the area was misplaced, he can offer no factual basis to back up this opinion.

Under the relevance prong of *Daubert*, an expert's opinion must go beyond a pure recital of the facts and speculation or conjecture. Here, Mr. Levenberg states that his opinions are based upon his experiences, pieces of "other assessment methodologies," generally reviewing data, looking at the existing operation and later common sense as well as assumptions, as stated above. There are recognized books, manuals and standards in the industry that Mr. Levenberg refuses to use. This would not be acceptable from a medical or engineering expert and must not be acceptable here. As discussed above, in Mr. Levenberg's own words, he relies on common sense and assumption in order to form the basis of his opinions in this matter. What Mr. Levenberg did not rely upon were the ASIS General Risk Assessment Guideline, or the court accepted International Association of Professional Security Consultants Best Practices: Forensic Methodology. In fact,

Mr. Levenberg's opinions are contrary to these guidelines, which state that the extent of the basis of foreseeability would extend only to the site and *immediate vicinity* for a three-to-five-year period prior to the date of the incident. The immediate vicinity is limited to the adjacent property and neighborhoods of the mall, not a location fifteen (15) miles away in another County, and not locations in the District of Columbia or Virginia. *See* ASIS International, The General Security Risk Assessment Guideline 12 (2003). Mr. Levenberg's standard of care that he sets forth is both factually void and self-serving. There can be no support for Mr. Levenberg's opined standard of care found in reliable principles and methods. Mr. Levenberg's opinions are not reliable, and thus are not relevant and would only serve to confuse the jury, as such, they must be stricken.

### b. David Levenberg's Opinion is Not Based on Sufficient Facts and Data and Amounts to "Because I Say So" Testimony

Even if Defendants were on notice, and even if the attack was foreseeable, plaintiffs cannot establish that Defendants security was inadequate or that it breached a baseline standard of care. An expert's opinion must be based on an adequate factual basis so that it does not amount to conjecture, speculation, or incompetent evidence. *City Homes, Inc. v. Hazelwood*, 210 Md. App. 678–79, 63 A.3d 713, 751 (2013). This Court's role as a gatekeeper requires more than simply "taking the expert's word for it." This Court cannot take Mr. Levenberg's word, based solely on personal experience and speculation, with respect to his opinions, admitting the same, as it fails to meet the evidentiary hurdle presented by Fed. R. Evid. 702. Mr. Levenberg's opinions as to industry standards and foreseeability are based solely on *ipse dixit* and there is far too great of an analytical gap between the facts of this case, the reliable methodology used by security industry professionals and Mr. Levenberg's proffered opinions. In fact, Mr. Levenberg's testimony that the Defendant's unreasonably relied on the Police Department as a source of information as to area crime is again contradicted by ASIS Guidelines, which specifically states that sources of

information on crime-related events include "intelligence from local, state and federal law enforcement agencies regarding threats or conditions that may affect the enterprise." *See* <u>Ex. H</u>, at p. 7. There is ample evidence that Defendants were in regular and frequent contact with the police, and it is reasonable and not below any standard of care for private entities, including malls, to rely on the formal and informal communications with local police to advise them of credible threats. *Id.* at p. 8.

This analytical gap between Mr. Levenberg's opinions and accepted methodologies cannot be bridged as Mr. Levenberg has no basis whatsoever for his opinion that a targeted domestic shooting occurring fifteen miles from the mall would put Defendants on notice of an imminent and foreseeable attack by Tordil the following day. Moreover, he cannot point to any written industry standards or literature in the security field upon which his opinions are based, thus the opinions amount to unsupported speculation and subjective belief. Mr. Levenberg has failed to identify an adequate foundation for his opinions based on the facts, written materials, or industry custom or practice setting forth a standard of care in line with his opinion – it is entirely "because he said so" and nothing more. Therefore, this Court as the gatekeeper must exclude Mr. Levenberg's testimony regarding foreseeability and reasonable industry standards in the instant case.

## V.    CONCLUSION

Defendants are entitled to Summary Judgment because the undisputed facts demonstrate that Defendants did not owe a duty to plaintiffs to protect them from Tordil's attack, because the attack was not foreseeable, Defendants were not the proximate cause of the attack, Defendants were not put on notice of any impending harm, and even if Defendants should have been on notice, Plaintiff's security expert fails to demonstrate a breach of the standard of care by Defendants. For all of these reasons, Defendants are entitled to judgment as a matter of law.

Respectfully submitted,

COUNCIL, BARADEL
KOSMERL & NOLAN, P.A.

_Brian T. Gallagher_____
Brian T. Gallagher
Michael N. Russo, Jr.
125 West Street, 4th Floor
Post Office Box 2289
Annapolis, Maryland 21404-2289
Telephone: (410) 268-6600
Email: Gallagher@cbknlaw.com
*Attorneys for Westfield*

_____/s/_____
Heather K. Bardot Bar No. 20161
Bancroft, McGavin, Horvath &
Judkins, P.C.
9990 Fairfax Boulevard, Suite 400
Fairfax, VA 22030
Telephone: 703-385-1000
Email: Hbardot@bmhjlaw.com
*Attorneys for PSC Defendants*